IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIKA L. MAYALL, | : |
| | :     CIVIL ACTION |
|             Plaintiff, | : |
| | : |
| v. | : |
| | :     NO.  14-2721 |
| CAROLYN W. COLVIN, | : |
| Acting Commissioner of Social Security, | : |
| | : |
|             Defendant. | : |

**MEMORANDUM**

BUCKWALTER, S.J.                                                                                                  August 11, 2015

       Currently pending before the Court are Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration's Objections to the Report and Recommendation of United States Magistrate Judge Carol Sandra Moore Wells.  For the following reasons, the Objections are sustained.

**I.     PROCEDURAL HISTORY**

       On June 3, 2011,  Plaintiff Erika Mayall, then thirty-one years old, filed applications for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. § 401, et seq. and Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq.  (R. 158–171.)[1]   Her claim alleged disability since February 1, 2009, due to multiple mental health disorders including depression, anxiety, bipolar

---

[1] For ease of discussion, citations to the administrative record will be referenced as "R. [page number]."

disorder, schizophrenia, ADHD, and a learning disabilty.  (Id. at 158, 200.)  The state agency denied both of Plaintiff's applications on September 2, 2011.  (Id. at 106–116.)  Plaintiff timely requested a hearing before an administrative law judge ("ALJ").  (Id. at 119–124.)  Following the hearing—at which Plaintiff, a vocational expert, and Plaintiff's father testified—ALJ Paula Garrety issued a decision, dated December 20, 2012, deeming Plaintiff "not disabled."  (Id. at 45–80, 16–33.)  Plaintiff then filed an appeal.  (R. 14–15.)  On March 25, 2014, the Appeals Council denied Plaintiff's request for review, (id. at 1–3), making the ALJ's ruling the final decision of the agency.  See 20 C.F.R. §§ 404.972, 416.1572.

Plaintiff initiated the present civil action in this Court on May 13, 2014.  Her Request for Review set forth four alleged errors as follows: (1) the ALJ improperly found that Plaintiff's impairments did not meet or equal Listing 12.04; (2) the ALJ improperly rejected the opinion of Plaintiff's treating psychiatrist; (3) the ALJ misinterpreted Plaintiff's father's testimony; and (4) the ALJ improperly deemed Plaintiff's testimony not entirely credible.  On June 17, 2015, United States Magistrate Judge Carol Sandra Moore Wells issued a Report and Recommendation ("R&R") recommending that Plaintiff's first two alleged errors be rejected on their merits, but that the case be remanded to the Commissioner for reconsideration of Plaintiff's father's testimony and reevaluation of Plaintiff's credibility.

Defendant filed Objections to the R&R on July 1, 2015, asserting that: (1) the ALJ properly evaluated the testimony of Plaintiff's father; and (2) the ALJ's credibility assessment is entitled to deference.  To date, Plaintiff has filed no response to the remand, making this matter ripe for judicial review.

II.  **STANDARD OF REVIEW**[2]

    A.  **Standard for Judicial Review of an ALJ's Decision**

It is well-established that judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000). "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 564–65 (1988)). When making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In other words, even if the reviewing court, acting de novo, would have decided the case differently, the Commissioner's decision must be affirmed when supported by substantial evidence. Id. at 1190–91; see also Gilmore v. Barnhart, 356 F. Supp. 2d 509, 511 (E.D. Pa. 2005) (holding that the court's scope of review is "'limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact'") (quoting Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001)).

    B.  **Standard of Review of Objections to a Report and Recommendation**

Where a party makes a timely and specific objection to a portion of a report and recommendation by a United States Magistrate Judge, the district court is obliged to engage in de

---

[2] The five-step sequential analysis for assessing a disability claim was adequately summarized by the Magistrate Judge. In lieu of repeating that discussion, the Court incorporates by reference that portion of the R&R into this Memorandum.

novo review of only those issues raised on objection. 28 U.S.C. § 636(b)(1); see also Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989). In so doing, a court may "accept, reject, or modify, in whole or in part, the findings and recommendations" contained in the report. 28 U.S.C. § 636(b)(1). The court may also, in the exercise of sound judicial discretion, rely on the Magistrate Judge's proposed findings and recommendations. See United v. Raddatz, 447 U.S. 667, 676 (1980).

## III. DISCUSSION

### A. Whether the ALJ Properly Evaluated the Testimony of Plaintiff's Father

The Commissioner first objects to the Magistrate Judge's recommendation that the case be remanded for further consideration of the testimony by Plaintiff's father. The law requires that the ALJ consider and weigh all relevant evidence, including nonmedical evidence from spouses, parents, other relatives, friends, and neighbors. Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000). Social security jurisprudence explicitly states that in order to fully and thoroughly evaluate a claimant's testimony and allow for meaningful appellate review of the decision, an ALJ must expressly consider and address the impact of testimony from lay witnesses. See Petro v. Astrue, No. Civ.A.09–2900, 2010 WL 4104582, at *12 (E.D. Pa. Aug. 31, 2010) (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)). Nonetheless, while an ALJ must make a credibility finding regarding the claimant's testimony by addressing, in part, any lay testimony, the ALJ need not make an explicit credibility finding regarding the lay testimony itself. See Watson v. Astrue, No. Civ.A.08-1858, 2009 WL 678717, at *4 (E.D. Pa. Mar. 30, 2009) ("[T]here is no requirement, statutory or otherwise, that the ALJ make an explicit credibility finding of any lay witness."); Bleistein v. Apfel, No. Civ.A.97-6717, 1999 WL 58655,

at *3 (E.D. Pa. Jan. 27, 1999) ("While the ALJ's decision must be 'accompanied by a clear and satisfactory explication of the basis on which it rests,' . . . there is no statutory requirement that the ALJ make an explicit credibility finding of a lay witness."); Bailey v. Astrue, No. Civ.A.07-4595, 2009 WL 577455, at *11 (E.D. Pa. Mar. 4, 2009) (finding that ALJ's failure to explicitly address testimony of plaintiff's mother was not error where ALJ weighed medical testimony against Plaintiff's testimony and mother's testimony was merely cumulative).

During the administrative hearing, Plaintiff's father, Russell Mayall, testified regarding Plaintiff's condition. His testimony, in its entirety, was as follows:

> ATTY: Thank you, Your Honor. Mr. Mayall, I brought you in here so that you can try to give the Judge an idea of how you feel Erika has been doing over the course of the last several years.
>
> WIT: Okay. She's been very moody. She's had—I know she's been on [sic] seeing her doctor. And then she—her social, social worker—not her social worker, her—not her psychiatrist, but her psychologist, she was in love with her so to speak. She really helped her get along. And then all the sudden she retired and—
>
> ATTY: That was a while back?
>
> WIT: That was a while back and she hasn't been able to find someone she can trust and talk to. She—she's like her mother. Her mother is very—she's had mental problems all—
> . . .
>
> ALJ: Well, let's—
>
> A: —her life.
>
> Q: Let's stay on track here. Let's talk just about her.
>
> A. No, I'm just—this is the family—
>
> Q. Well, just talk about—
>
> A. —history of it.

5

Q. —your daughter, okay.

A. Okay.

Q. Your daughter is not currently in therapy, correct?

A. With a psychiatrist, yes. With a psychologist, no. She hasn't found one she liked or that she can feel comfortable with.

EXAMINATION OF WITNESS BY ATTORNEY:
Q. What is she like around the house?

A. She gets—at times she gets very moody, very quiet. She will not eat. It's at that point that I realize that we have to make her sit down and eat and get her to do various things, anything to keep her mind off what she's thinking about. She's—her mind is very negative. She doesn't think positive. If you give her a—say something happens and it could be either positive, negative or neutral, she'll always think it's negative almost all the time. And we just have to tell her positive things about it and keep her to think on a positive track.

Q. Are there thing [sic] that you and your wife do to help her?

A. Yes, I've—I keep her kids occupied, her children. I do homework with them. She's always had problems with reading and mathematics. And I've always taken it upon myself to help them with their homework and make sure they understand what's happening.

Q. When she was in school, was she in special ed?

A. Yes, she was starting in second grade. In second grade her teacher realized that she had problems. They had her tested. And from that point on she had an IEP. They—the school tried to drop her every, every couple of years from the program, and like her two teachers in elementary school told me that she really needs this help and that I'm to tell them that we don't agree to drop her. That therefore, you know, if they want to drop her, they're going to have to take us to court to drop her. And she's always had problems. I know she's used it in elementary school and middle school. In high school she would have to go to the resource room, as they call it, and talk to her teachers. They would help her take her tests. They would give her the extra time she needed to get through it.

Q. Okay. What other things do you do with your grandkids?

A. I take them to soccer—baseball. I take them wherever they have to go. I try to

6

get her to be more actively involved with them, make her do these things so she won't sit around and do nothing, which starts her on her downward spiral.

Q. Is it difficult to convince her to do these things?

A. Sometimes, sometimes it is and sometimes it—she'll realize that she'll, she'll do it, but a lot of times it's no [sic] and we have to sort of force, force her or make her do certain things that she doesn't want to do.

Q. Do you feel like she could live independently right now?

A. Right now?

Q. Yeah.

A. No, not at all. She's—she keeps thinking the negative thoughts and, she doesn't want to, to do things and we have to get her to keep active and, and eat. Bec[ause] once we see her not eating we know something is starting to happen.

Q. You're aware of the time she's been hospitalized?

A. I'm the one who (INAUDIBLE) to her, three times.

Q. Can you tell me the three, three times you (INAUDIBLE)?

A. The first time was when her—in her 20s where we found—she always wore the long sleeves and we never noticed it until somebody told her there were cut marks on her arm. We immediately took her to a mental health unit and they said that she has to go in right way. And I signed her in right then. Then there were two other times. One where she was over—overdosed and I took her into the hospital and they recommended her and I filled out all the paperwork. And then there's one—another one not too long ago where she went out the window. And again, she was acting real crazy around—in her, her room and everything and I just immediately went up and had her committed. And the police came and had to forcibly take her.

Q. Are you aware of whether she is or is not currently cutting?

A. I, I have not been aware of it. I have not seen it on her arms because that was her usual place. I, I know she has scars all over her face. Her excuse before was always that she fell and hit them going down. I only recently found out that they were really—she was cutting herself.

Q. Even on her face?

>   A. Even on her face.
>
>   Q. Is there anything else you feel like the Judge should know?
>
>   A. I think she's—right at this point, I agree, she cannot live independently on her own. She needs somebody to sit there and be aware of her problems. And she—you see the telltale signs to get her some help, get her out of her—as I call it, her funk and get her to do things. Keep her active. Keep her mind thinking positive. Keep telling her things will work out, things are doing well, you just have to think positive and go from there.

(R. 75–79.)

On review, the ALJ did not simply disregard this testimony. Quite to the contrary, the ALJ expressly acknowledged such testimony and stated that, "[w]hile the testimony of Mr. Mayall is accepted as generally credible, even when credited, this evidence does not support a finding of work preclusive limitations." (R. 26.) She went on to indicate that "[w]ith regard to Mr. Mayall's testimony, even were the entirety of his testimony accepted as true and accurate, this reveals only that claimant's symptoms are intermittent and not such as would be work-preclusive." (R. 26.)

The Magistrate Judge found the ALJ's analysis to be in error. Specifically, the R&R provided as follows:

> The ALJ stated that she found Mr. Mayall's testimony "generally credible," yet, she found that his testimony, even if fully believed would not support finding work-preclusive limitations. . . . Furthermore the ALJ found that Mr. Mayall's testimony demonstrated that Plaintiff's symptoms were intermittent, hence, not work-preclusive. This conclusion is simply unsupported by the record. Mr. Mayall testified that Plaintiff's mental health symptoms were chronic, lasting for several years. . . . He further testified that Plaintiff has negative thoughts, does not eat without reminders, cannot attend to her children, is unable to help them with homework, and cannot live independently, because of her negative thoughts and inability to eat. . . . Mr. Mayall never stated that these symptoms were intermittent and a fair reading of this testimony does not support the ALJ's conclusion that, if his testimony is believed, he stated that Plaintiff's symptoms are intermittent. This error

> is not harmless, because the ALJ's erroneous understanding that Mr. Mayall testified to Plaintiff's symptoms being intermittent directly resulted in the ALJ's conclusion that Mr. Mayall's testimony did not support a finding of work-preclusive symptoms. This case should be remanded so that the ALJ can correctly consider Mr. Mayall's testimony and pose hypothetical questions to a VE which reflect the credible limitations Mr. Mayall described.

(R&R 14.)

The Court must respectfully disagree with the Magistrate Judge's recommendation. As set forth above, the standard of review on consideration of an ALJ's decision is whether that decision is supported by substantial evidence. While Mr. Mayall's testimony could have been interpreted, on one hand, to suggest that Plaintiff's symptoms were ongoing and chronic over the course of several years, the ALJ had substantial support for interpreting Mr. Mayall's testimony to suggest, on the other hand, that the symptoms were intermittent and would not have lasted for a period of twelve months or more.[3] Mr. Mayall indicated that Plaintiff's former psychologist, who retired, really "helped her get along." (R. 75.) He went on to state that "[s]he gets—*at times* very moody, very quiet. She will not eat. It's *at that point* that I realize that we have to make her sit down and eat and get her to do various things." (R. 76 (emphasis added).) When asked if it is difficult to convince Plaintiff to get involved with her children, Mr. Mayall responded that "*[s]ometimes, sometimes it is* and sometimes it—she'll realize that she'll, she'll do it, but a lot of times it's no [sic] and we have to sort of force, force her or make her do certain things that she doesn't want to do." (R. 78 (emphasis added).) Finally, when asked if he felt that Plaintiff "could live independently right now," he responded, "Right now? . . . No, not at

---

[3] "The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

all." (Id.) Later, he stated, "I think she's—*right at this point*, I agree, she cannot live independently on her own." (R. 79 (emphasis added).) Thus, while Mr. Mayall clearly indicated that Plaintiff's symptoms existed over the course of many years, he repeatedly suggested that she went through periods where she was stable and periods where she needed support. "Where evidence in the record is susceptible to more than one rational interpretation, we must accept the Commissioner's conclusions." Izzo v. Comm'r of Soc. Sec., 186 F. App'x 280, 284 (3d Cir. 2006) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ; see also Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002); Trinh v. Astrue, 900 F. Supp. 2d 515, 520 (E.D. Pa. 2012) (holding that where the ALJ unquestionably considered the testimony of the plaintiff's daughter in reaching the disability determination, which was supported by substantial evidence, the court would not remand the case). As the Court finds the ALJ's interpretation of Mr. Mayall's testimony to be rational, remand for reconsideration of this evidence is unwarranted.

Moreover, even assuming that the ALJ's interpretation of Mr. Mayall's testimony was not well-founded, the Court deems the error harmless. The harmless error standard is well-established in our jurisprudence. See Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (refusing to remand where stricter compliance with social security ruling would not have changed the outcome of the case). In many cases, courts have found that an ALJ's failure to address lay opinion testimony, although technically in violation of applicable legal standards, did not require remand since the testimony would not have changed the outcome of the case. See, e.g., Bailey v. Astrue, No. Civ.A.07–4595, 2009 WL 577455, at *11 (E.D. Pa. Mar. 4, 2009) ("In this case, the ALJ did not explicitly address the testimony of plaintiff's mother in the decision. However, the ALJ examined the medical evidence (which he found does not support the

plaintiff's subjective complaints of pain and limitations) and weighed that against the plaintiff's testimony.  As a result, the ALJ found plaintiff's complaints only partially credible. . . . plaintiff's mother's testimony would not have changed the ALJ's decision, as it was cumulative and merely reiterated the fact that plaintiff experienced pain which she observed when he visited her."); Thompson v. Astrue, No. Civ.A.07–2989, 2009 WL 7007996, at *15 (E.D. Pa. Jan. 30, 2009) (holding that where discussion of lay witness's letter would not have changed the outcome of the case, failure of the ALJ to address it was harmless error); DeStefano v. Astrue, No. Civ.A.07–3750, 2009 WL 113744, at *10 (E.D. Pa. Jan. 14, 2009) (noting that the ALJ's failure to address non-medical testimony does not require remand where the medical evidence in the record supported the ALJ's RFC determination); Carnes v. Comm'r of Soc. Sec., No. Civ.A.08–99, 2008 WL 4810771, at *5 (W.D. Pa. Nov. 4, 2008) (noting that where mother's testimony was essentially cumulative of plaintiff's testimony and further discussion of it would not have changed the outcome, failure to discuss the mother's testimony was harmless error that did not require remand); Combs v. Barnhart, No. Civ.A.03–5526, 2005 WL 1995457, at *2 (E.D. Pa. Aug. 16, 2005) (refusing to remand on harmless error grounds where ALJ failed to consider testimony of claimant's wife and there was substantial evidence to support the credibility determination).

     As discussed above, Mr. Mayall essentially testified that Plaintiff gets very moody and quiet, she often will not eat without prompting, she thinks negatively about most situations, she needs prompting to do things to prevent her from just sitting around and starting a "downward spiral," and she needs somebody to live with her and keep her active so she stays out of her "funk."  Upon full consideration of the medical and lay testimony of record, the ALJ assessed

Plaintiff with the residual functional capacity to perform light work with various physical restrictions, and indicated that she was limited to "simple, routine tasks with no detailed instructions or multiplication requirements, and no more than limited contact with the public and supervisors, in a work environment with few changes." (R. 24.) She specifically noted that Mr. Mayall's testimony did not support a finding of any other work preclusive limitations. (R. 26.) Plaintiff now fails to identify what additional work-related limitations should have been imposed based on Mr. Mayall's testimony. As the Court cannot discern how Mr. Mayall's testimony would have resulted in a more restrictive RFC, remand for further consideration of that testimony would be a futile exercise.

In short, the Court respectfully declines the Magistrate Judge's recommendation to remand the case for reconsideration of Mr. Mayall's testimony. The ALJ's interpretation of Mr. Mayall's testimony as describing an intermittent condition was well-founded. Moreover, the ALJ appears to have already incorporated into the RFC all of the limitations suggested by Mr. Mayall. Accordingly, this objection is sustained.

### B.     Whether the ALJ Improperly Evaluated Plaintiff's Credibility

The Commissioner also objects to the Magistrate Judge's recommendation that the case be remanded for a re-weighing of Plaintiff's credibility with respect to her own limitations. It is well established that an ALJ is required to "give serious consideration to a claimant's subjective complaints of pain [or other symptoms], even where those complaints are not supported by objective evidence." Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985)). Objective evidence of the symptoms themselves need not exist, although there must be objective evidence of some condition that could

reasonably produce them.  <u>Green v. Schweiker</u>, 749 F.2d 1066, 1070–71 (3d Cir. 1984).  Where medical evidence supports a claimant's complaints, the "complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence."  <u>Mason</u>, 994 F.2d at 1067–68 (quotations omitted).  The ALJ, however, "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints if they are not fully credible."  <u>Weber v. Massanari</u>, 156 F. Supp. 2d 475, 485 (E.D. Pa. 2001) (citing <u>Baerga v. Richardson</u>, 500 F.2d 309, 312 (3d Cir. 1974)).

   Under the regulations, the kinds of evidence that the ALJ must consider when assessing the credibility of an individual's statements include: the individual's daily activity; location, duration, frequency, and intensity of the individual's symptoms; factors precipitating and aggravating the symptoms; the type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; treatment, other than medication, received for relief of the symptoms; any non-treatment measures the individual uses to relieve pain or symptoms; and other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§  404.1529(c)(3), 416.929(c)(3).  Moreover, the ALJ should account for the claimant's statements, appearance, and demeanor; medical signs and laboratory findings; and physicians' opinions regarding the credibility and severity of plaintiff's subjective complaints.  <u>Weber</u>, 156 F. Supp. 2d at 485 (citing Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (S.S.A. 1996)).  Ultimately, the ALJ's "'determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'"  <u>Schwartz v.</u>

Halter, 134 F. Supp. 2d 640, 654 (E.D. Pa. 2001) (quoting SSR 96-7p; Schaudeck v. Comm'r of

Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999)).

The ALJ, in this case, engaged in an extensive credibility analysis, as follows:

After careful consideration of the evidence, the undersigned finds that claimant's medically determinable impairments could reasonably be expected to cause symptoms; however claimant's statements and testimony, and the written statement of Ms. Riley concerning the extent, character, intensity, persistence and limiting effects of the alleged symptoms are not entirely credible to the extent and for the reasons explained in this decision. . . .

Despite her alleged difficulties, claimant admitted she cared for her children and was a single mother; she further admitted she cooked and cleaned (though with assistance), drove, shopped in stores, handled finances (though only sometimes use [sic] a checkbook/money orders and spent time with others . . . .  Despite her allegations regarding her mental health limitations, she admitted she followed written instructions very well and was "hands-on".  Moreover, Ms. Riley admitted claimant took care of her children and prepared meals, though she sometimes lost focus while doing so; she further noted claimant tried to dust and clean tables, but had some difficulty due to her right shoulder impairment . . . .  Ms. Riley reported claimant drove a car, could go out alone, shopped in stores, handled finances (depending on her mindset) and spent time with others.

Moreover, claimant's testimony is not consistent with the objective medical evidence, as set forth below.  At the hearing, claimant testified she "tried" cocaine "many, many years ago," asserting it was over five years ago; she testified she never used any other illegal drug, except marijuana, which she admitted she last used three weeks prior to the hearing.  However, the records document that claimant used cocaine and heroin as recently as April 2011; even in the face of these records, discussed below, claimant denied ever doing heroin and cocaine and asserted that the April 2011 hospital records, indicating positive findings on drug screening tests, were wrong.  The undersigned accepts the objective medical records over claimant's self-serving hearing testimony.  Further, with regard to claimant's fall from a second story window, at the hearing she testified this was a suicide attempt, but the hospital records indicate she denied this was a suicide attempt when questioned at the time.  Claimant also testified she cut herself "hundreds of times" to include a self-inflicted forehead cut in late 2011 or early 2012.  Emergency room records reflecting treatment for a forehead cut (claimant received stitches) reflect claimant reported she had fallen; at the hearing claimant testified she "made up" the story about falling.  In fact claimant testified she never told anyone about her cutting behavior until the very day of the hearing, when she

14

> finally revealed this behavior to her representative.
>
> . . .
>
> Additionally, claimant's activities [are] not indicative of an individual with entirely work-preclusive limitations; she is a single mother raising three children (ages 12, 9 and 5) and cares for them and drives with them in the car. She is not in actual therapy and only sees Jeff Woloshin, M.D., once or twice a month for 15-minute medication checks. Claimant testified to a litany of problems, to include that she could not use her right leg for a period of a year, but her testimony is inconsistent with and unsupported by the evidence of record.

(R. 26.)

The Magistrate Judge, however, found that the ALJ did not properly evaluate Plaintiff's credibility. Specifically she noted that because Mr. Mayall testified to enhance Plaintiff's credibility concerning her impairments, the ALJ's failure to properly evaluate Mr. Mayall's testimony tainted her evaluation of Plaintiff's credibility. (R&R 15.) The Magistrate Judge went on to question the ALJ's reliance on Plaintiff's conflicting stories regarding her drug use as a basis on which to discredit her testimony, but nonetheless found that "Plaintiff's prior admission that she had used heroin would permit the ALJ to conclude that she lied about her past heroin use at the October 2012 hearing." (R. 15.) Ultimately, the ALJ noted that "this court also cannot determine that, if the ALJ had properly weighed Mr. Mayall's testimony, which largely corroborated Plaintiff's testimony about her limitations, the ALJ still would have found Plaintiff not credible about her limitations." (R. 16.)

Again, this Court must disagree. Primarily, to the extent the Magistrate Judge based her recommendation on the ALJ's assessment of Mr. Mayall's testimony, this finding is mistaken. As discussed above, the ALJ fully considered Mr. Mayall's testimony, noted it was generally credible, but found that it neither described a consistent impairment nor suggested work-

preclusive limitations. Nothing in the ALJ's opinion indicates that further crediting Mr. Mayall's testimony would have affected her credibility assessment of Plaintiff's testimony in any way.

Moreover, the ALJ's discussion of Plaintiff's credibility properly relied on various other factors set forth in the regulations. First, the ALJ properly noted inconsistencies in the record. During Plaintiff's hospitalization in April 2011, Plaintiff expressly admitted "to doing drugs like cocaine, Percocet, oxycodone, heroin, resulting in behavior leading to hospitalization." (R. 410.) Yet, at the hearing, Plaintiff adamantly denied ever touching heroin in her life, and stated that she had not used cocaine in over five years. (R. 58.) Moreover, at the hearing Plaintiff testified that her April 2011 fall from a second story window was a suicide attempt (r. 57), yet denied that same story to the hospital and her doctors. (R. 340, 410.) Finally, Plaintiff claimed to have engaged in "cutting" over the course of many years (r. 54–56), yet admitted to not telling anyone about these acts until the day of the hearing. (R. 56.) As the ALJ was entitled to consider such inconsistencies in weighing Plaintiff's credibility, the Court finds no error in the ALJ's credibility analysis. See Gilmore v. Barnhart, 356 F. Supp. 2d 509, 513–14 (E.D. Pa. 2005) (noting that ALJ may consider inconsistencies between Plaintiff's testimony and the record when evaluating credibility).

Second, the ALJ appropriately noted that Plaintiff's activities of daily living were not consistent with her testimony that she was precluded from doing all work. It is well established that the ALJ may consider the extent of daily activities in determining the credibility of a claimant's testimony. Turby v. Barnhart, 54 F. App'x 118, 121 n.1 (3rd Cir. 2002). As Plaintiff's admitted activities were inconsistent with a finding of disability, the ALJ properly relied on such activities to discount some of Plaintiff's testimony.

Finally, the ALJ accorded less weight to Plaintiff's subjective complaints based on their inconsistency with the medical evidence of record. The ALJ remarked that contrary to Plaintiff's complaints of disabling mental illness, Plaintiff was not in actual therapy and only saw a psychiatrist once a month for medication checks. (R. 26.) Moreover, the ALJ commented on Plaintiff's relatively normal mental health examinations and limited treatment, together with the finding by state agency physician Dr. Hite that Plaintiff was capable of performing simple, routine work in a stable environment. (R. 29–31.)

Ultimately, the ALJ did not entirely discount Plaintiff's complaints of mental health symptoms. Indeed, as noted above, the ALJ found that Plaintiff was limited to simple, routine tasks with no detailed instructions or multiplication requirements and no more than limited contact with the public and supervisors, in a work environment with few work changes. (R. 24.) Rather, the ALJ discredited Plaintiff's testimony regarding the extent, character, intensity, persistence, and limiting effects of the alleged symptoms. In doing so, the ALJ properly considered the objective medical evidence of record, Plaintiff's activities of daily living, and inconsistencies in Plaintiff's testimony. "'[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.'" Love v. Astrue, No. Civ.A.12-1923, 2014 WL 4915998, at *6 (M.D. Pa. Apr. 22, 2005) (quoting Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)). Where, as here, the ALJ has adequately provided specific reasons for the credibility determination, that determination is given great deference. Washington v. Barnhart, No. Civ.A.04-1137, 2005 WL 701802, at *8 (E.D. Pa. Mar. 25, 2005). Therefore, the Court sustains this objection as well.

...

### III. CONCLUSION

For all of the foregoing reasons, the Court finds that substantial evidence supports the ALJ's finding of "not disabled" and that any error committed by the ALJ is harmless and does not affect the outcome of the case. As remand will likely not result in any different result, the Court will sustain Defendant's Objections and affirm the decision of the Commissioner of Social Security.